UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.                              )
                                              )
CRAIG COMMUNAL,                               )
    a Colorado resident,                     )
                                              )
Plaintiff,                                    )
                                              )
v.                                            )
                                              )
CITY OF WESTMINSTER,                          )
    a Colorado home rule municipality,       )
                                              )
Defendant.                                    )

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff, Craig Communal ("Mr. Communal"), through counsel, states the following as his Complaint and Jury Demand ("Complaint") against the City of Westminster, Colorado ("Westminster").

## SUMMARY OF THE ACTION

This is a disability discrimination lawsuit, brought under the Americans with Disabilities Act, 42 U.S.C.A. §§12101 *et seq.* ("ADA"). From March 22, 2004 to September 19, 2018, Mr. Communal worked as a police officer for the Westminster Police Department ("Police Department"). In that capacity, he was the most decorated officer in the Police Department, receiving more medals than any other active police officer in the Department.

In January 2010, Mr. Communal was diagnosed with leukemia. Although Mr. Communal had never suffered any significant discipline, a few days after he disclosed his diagnosis, Mr. Communal was severely disciplined, initially for supposedly failing to respond to calls on his

1

radio, and then (after an alleged investigation of Mr. Communal's traffic patterns over a three month period, when he was experiencing the worst of the leukemia symptoms), for spending a too much time while on duty near his home and his mother's home. Mr. Communal quickly understood the lesson being communicated to him: Do not claim to be impaired or disabled, because a disability or impairment would not be tolerated. Mr. Communal also understood a second lesson: working hard and following the rules were no protection, because the Police Department would go to great lengths to punish those they wanted to punish.

Unfortunately for Mr. Communal, a police officer sometimes stands in harm's way. Mr. Communal suffered substantial on-duty injuries in 2016 and 2017; and although Westminster conducted surveillance on Mr. Communal after each injury, it failed to find any deception by him.

Westminster, however, was undeterred in its efforts to rid itself of Mr. Communal.  At the behest of the Deputy Chief, and working with the police department of Platteville, Colorado, the two departments cobbled together a list of contacts Mr. Communal, or his family, had with various police departments, including at least one police department outside of Colorado; and used them as a basis for terminating his employment.  But even a cursory review of those allegations shows that they provide no basis for terminating Mr. Communal's employment. Rather, the reason for termination was the disability Mr. Communal had because of leukemia, and the injuries he received in the line of duty, causing additional disabilities.

## PARTIES

1.      Mr. Communal is a Colorado resident who resides in Weld County, Colorado. Mr. Communal worked full-time as a Police Officer for the Westminster Police Department as a full-time employee from March 2004 to September 24, 2018.

2. Westminster is a Colorado municipality and home rule city, located in Adams and Jefferson Counties.

## JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States. *See* ADA, 42 U.S.C.A. §§12101 *et seq.*

4. This action is timely because Mr. Communal was discharged by Westminster on September 19, 2018, and Mr. Communal submitted the EEOC Intake Questionnaire to the EEOC on July 3, 2019. July 3, 2019 is less than 300 calendar days after his discriminatory discharge on September 19, 2018.

5. This action is also timely because the EEOC issued its Notice of Right to Sue letter to Mr. Communal on July 24, 2019, and this action has been filed within ninety days of that date.

6. Venue in ADA cases is determined either by 42 U.S.C. § 2000e–5(f), or by 28 U.S.C.A. § 1391, and venue is proper in this judicial district under either provision. *See Chubb v. Union Pac. RR. Co.*, 908 F. Supp. 853, 854 (D. Colo. 1995) (discussing split in authority, but holding that § 2000e–5(f) was the governing provision); *Borchik v. Corelogic*, 2017 WL 4407926, at *3 (D. Colo. Apr. 24, 2017) (§ 2000e–5(f) is governing provision).

## FACTUAL ALLEGATIONS

7. Mr. Communal incorporates by reference paragraphs 1 through 6, as if fully set forth in these factual allegations.

8. Mr. Communal has worked full-time as a police officer for his entire working life. In March 2004, he began working as a police officer for the Westminster Police Department. Between 2004 and 2010, he was the most decorated officer in the Department. Mr. Communal had

been awarded more medals than any other active police officer working in the Department, including three .Distinguished Medals, two Meritorious Medals, and a Life Saving Medal from Taser International.

9. This abruptly changed in 2010. In January 2010, Mr. Communal was diagnosed with chronic myeloid leukemia ("CML"), an uncommon form of blood-cell cancer that begins in the bone marrow. At the time, Mr. Communal worked as a traffic police officer.

10. The CML may have been caused by a raid on a methamphetamine lab while Mr. Communal was working for the Eagle County Sheriff's Department. Both Mr. Communal and another sheriff deputy who participated in the raid were diagnosed with CML some years later. The other deputy died from the illness.

11. CML has three phases, based mainly on the number of immature white blood cells, called "blasts," found in the blood or bone marrow. An average person has a white blood cell count ranging between 4,000 and 10,000. At the time of diagnosis, Mr. Communal's white blood cell count was 198,000.

12. The three phases of CMI are: the chronic phase; the accelerated phase, and the blast phase. At the time he was diagnosed, Mr. Communal was near the blast phase, and was suffering symptoms from the CML that included feeling run-down and tired, fever, incontinence, headaches, and loss of appetite and weight.

13. Due to medical developments since 1990, treatment of CML through medication is now largely successful. Although CML was once routinely fatal, sufferers of the disease now have a five-year survival rate of 95 percent because of medicine they take.

4

14. The doctor who diagnosed the CML told Mr. Communal that he needed to take it easy at his job, and told him not to do physically strenuous activities such as foot chases as in his weakened condition they could lead to a heart attack or stroke.

15. The same day he received the diagnosis of CML, Mr. Communal spoke to his direct supervisor, Sergeant Martinez, about it. Mr. Communal told the Sergeant that, among other thing, he was not feeling well, he felt severely fatigued and had no energy, and he was having other physical difficulties including headaches and loss of bladder control.

16. Sergeant Martinez did not take Mr. Communal off active duty. Rather, Sergeant Martinez told Mr. Communal that he should "lay low" for a few days to see if he felt better. Mr. Communal did as he was directed, and – particularly because of the incontinence problem – he kept his traffic patterns close to his home or his mother's home.

17. Shortly after his discussion with Sergeant Martinez, Mr. Communal notified the Human Resources Division of Westminster of the CML diagnosis.

18. A few days later, on February 4, 2010, Mr. Communal was called into a meeting with Sergeant Martinez and Sergeant Paquet.

19. The meeting included a brief discussion of Mr. Communal's diagnosis of CML, his disclosure of the leukemia to Sergeant Martinez, the disease's severity, and the steps taken by the Sergeant in light of the diagnosis: not removing Mr. Communal from active service, but directing him to lay low because of the illness.

20. At the meeting, Mr. Communal was told he was being placed on restricted duty because of his illness.

21. Mr. Communal was then told that the reason for the meeting was because on January 4, 2010, he had been reported for failing to respond to his call sign four times within a two hour period.

22. Supposedly because he was not answering his radio, a global positioning system searched for the location of Mr. Communal's vehicle. The results of the search, Mr. Communal was told, was that the vehicle had been parked in a location close to Mr. Communal's mother's home. Sergeant Paquet attacked Mr. Communal for his vehicle patterns, and threatened Mr. Communal with firing and/or criminal charges.

23. Subsequently, upon information and belief Sergeant Martinez denied that he was told of the diagnosis, denied that he had been told that he was at risk for a heart attack or stroke, and denied that he had told Mr. Communal to "lay low."

24. The Police Department was not done with making attacks on Mr. Communal. According to Chief Birk and Deputy Chief Carlson, after Mr. Communal was reported for not responding to his call sign, Sergeants Paquet and Martinez then decided to conduct an investigation of Mr. Communal's traffic patterns, and supposedly found that he spent substantial time near his home or his mother's home over the prior three-months.

25. The allegations made against Mr. Communal were not credible for at least three reasons. First, the supposedly instigating factor – Mr. Communal's failure to respond to his call sign – ignores the fact that the protocol for a dispatcher is to call the police officer's cell phone when he does not answer the radio, and no such calls were made to his cell phone during the day or time period at issue.

26. Second, the degree of hostility of the Police Department was grossly excessive. As mentioned previously, at the February 4, 2010 meeting, Sergeant Paquet threatened Mr. Communal with firing and/or criminal charges.

27. Third, the timing of the meeting was suspicious, coming shortly after he had disclosed his leukemia to his supervisor and the Police Department.

28. Additionally, the Police Department failed to recognize the mitigating factor that the time period during which Mr. Communal's traffic patterns were investigated corresponded closely to the time period in which Mr. Communal's leukemia was developing, and his symptoms were increasing. At a minimum, the Police Department should have recognized that Mr. Communal's problems with nausea, fatigue, and incontinence would have led him to patrol areas where he could take a brief rest period or a bathroom break.

29. On February 12, 2010, Mr. Communal was taken off restricted duty because of his favorable response to the medication for CML.

30. On March 10, 2010, Chief Burke concluded that Mr. Communal had no excuse for the allegedly "excessive time" Mr. Communal had spent at or near his home, or his mother's home. The Chief apparently did not consider the symptoms from leukemia to be a legitimate excuse.

31. The Chief penalized Mr. Communal, including suspending him for three days without pay, removing him from the Traffic Section, requiring him to pay Westminster for forty-nine hours of leave, taking his status relieving him from as a Drug Recognition Expert, and removing him from his position as a S.W.A.T. team negotiator.

32. Although Mr. Communal's improved health allowed him to go back on full-time duty, his conduct was watched very closely, and he was wrongfully penalized by the Police Department in 2011 and 2012 for incidents for which he had no culpability. For instance:

   a. In 2012, written discipline was put in Mr. Communal's Log Book & Appraisal based on an unsupported – and false – allegation that he had distributed literature for a driving school at a public meeting. Mr. Communal was not given the opportunity to rebut the false allegations, no investigation was conducted, and no witnesses were interviewed before Mr. Communal was disciplined.

   b. In 2012, Mr. Communal was involved in a vehicle pursuit in which a DUI driver ended up striking one of the pursuing vehicles head-on. Although Mr. Communal was not himself involved in the accident, he was nonetheless disciplined for reporting the "ramming" over the radio, supposedly because reporting the incident might somehow have escalated the response. Mr. Communal was written up for the incident, and the write-up was attached to his annual appraisal.

33. These and other events led Mr. Communal to recognize that his leukemia had made him persona non grata in the Westminster Police Department, and that he needed to be very careful not to show any weakness or impairment, or to appear to be disabled in any way to keep his job.

34. The events in 2010, 2011, and 2012 also showed that Mr. Communal could be erroneously attacked by other police officers without justification, and he could be wrongly punished without provocation, simply because he was disabled.

35. In 2016, Mr. Communal suffered a second altercation that further impaired him physically. While Mr. Communal was on duty, he was attacked and mauled by a Westminster K9. The damage resulted in seven months of worker's compensation leave, three surgeries, and permanent nerve damage in the foot and leg.  Mr. Communal permanently lost feeling from below his knee down to his foot, and is forced to wear a leg brace sometimes because he now suffers from drop foot.

36. Because of the injuries he received, Mr. Communal's ability to stand or walk for long periods of time. Further, the pain from his leg and foot interferes significantly with his ability to sleep.

37. In August 2016, Mr. Communal was cleared to return to work without any restrictions, although the worker's compensation doctor did not give an impairment rating to Mr. Communal. Subsequently, a Division Independent Medical Examination Doctor (a "DIME Doctor") named Dr. Roshenbager ignored the permanent damage to Mr. Communal, and gave him a zero percent impairment rating.

38. Subsequently, in late 2016, despite the fact that Mr. Communal was cleared to return to work without any restrictions, Westminster began to conduct surveillance on him and his family, and members of his family were followed and photographed.

39. Upon information and belief, this surveillance was not intended for any legitimate purpose – indeed it could not have had such a purpose because Mr. Communal was cleared without restriction. Rather, it was intended to harass Mr. Communal and his family and put pressure on him to resign from the Police Department.

40. It did not work.

41. In October 2017, Mr. Communal was injured in another on-duty incident. While chasing a burglary-suspect, a fence Mr. Communal was climbing collapsed on him, causing severe injuries, including a torn rotator cuff, to his left shoulder.

42. Mr. Communal filed for worker's compensation. On June 7, 2018, on the advice of the worker's compensation doctor, Mr. Communal had surgery on his shoulder, and was out of work for approximately six weeks. Subsequently, a DIME Doctor, Dr. Brian Beatty, gave Mr. Communal a thirteen percent impairment rating due to the injuries to his shoulder and back.

43. Mr. Communal understood that because of his thirteen percent impairment, Westminster would regard him as disabled, making it unlikely that Westminster would want him to be in its Police Department.

44. On July 18, 2018, Mr. Communal was cleared for limited work (5 hour shifts on the desk/light duty) with restrictions.

45. On July 21, 2018, Mr. Communal went to a lake with my friends and family. Although he went out on a boat, he did not participate in any restricted activity. Subsequently, during an appointment with his worker's compensation doctor, Mr. Communal was told that his doctor had seen video footage, provided by the Police Department, showing Mr. Communal at the lake. Upon information and belief, the Police Department had hired investigators to follow and record his activities in a futile attempt to establish that Mr. Communal was not actually impaired.

46. Again, the surveillance did not show any violation by Mr. Communal of his restrictions. Although the Police Department falsely accused Mr. Communal of "potential deception," with respect to his worker's compensation claim – claiming that he had been

videotaped lifting heavy objects, jogging, and the like – when the tape was reviewed, it was discovered that the individual being videotaped was not Mr. Communal.

      47.     The Police Department was undeterred in its efforts to force Mr. Communal out. An Internal Affairs investigation was begun, ostensibly to investigate a dozen or more contacts over a two year period involving instances in which Mr. Communal or his family had interactions with other police officers. The contacts fell into five categories:

    a. Four contacts while Mr. Communal was driving a vehicle and was pulled over by a police officer in another jurisdiction. In each instance, Mr. Communal indicated he was a police officer because he had a gun in the car, but he did not ask not to be ticketed. Nonetheless, Westminster took the position that by identifying himself as a police officer, Mr. Communal had implicitly asked the officer not to ticket Mr. Communal.

    b. One alleged stop by a Platteville police officer that never happened.

    c. Five instances in which the police were called because of disturbances by Mr. Communal's wife or daughter. Although Mr. Communal was not even involved in most of the incidents, Westminster took the position that Mr. Communal had somehow done something wrong because his wife was disorderly.

    d. One instance in which Mr. Communal was involved in an accident, which should not be considered a firing offense;

    e. One road rage incident in Wyoming in 2016 in which a driver of a pickup truck pointed a gun at Mr. Communal when he passed the truck, an event Mr. Communal himself reported.

48. On July 26, 2018, the Police Department suspended Mr. Communal with pay. Approximately two months later, he was discharged.

49. The supposed reasons given for Mr. Communal's discharge are pretextual, and provide no legitimate basis for the termination of his employment.

50. Rather, the real reason for the termination was Mr. Communal's successive illnesses and injuries, and his disability, or the fact he was regarded as disabled, because of them.

### FIRST CLAIM FOR RELIEF
(Violation of the ADA, 42 U.S.C.A. §§12101 *et seq.*)

51. Mr. Communal incorporates by reference the allegations set forth in paragraphs 1 through 48 as if fully set forth in this Claim for Relief.

52. Mr. Communal is an individual who suffers from one or more disabilities, as that term is defined in 42 U.S.C. § 12102, or who is regarded as having an impairment, in that (a) he suffers from CML, and (b) his on-duty injuries have rendered him partially disabled.

53. Mr. Communal's disabilities substantially limit one or more major life activities, including sleeping, walking and standing.

54. Mr. Communal's disabilities also substantially limit or impair the operation of a major bodily function: the performance of his immune system and the normal cell growth within his body.

55. Although Mr. Communal's CML is currently controlled by medicine, he must continue to take the medicine because the CML is likely to return absent the medicine; and CML is deadly if not controlled. Accordingly, the ameliorative effects of the medicine controlling the CML should not be regarded in determining that Mr. Communal is disabled. *See* 29 C.F.R. 1630.2(j)(1)(iv).

56. Alternatively, although Mr. Communal has not required or sought a reasonable accommodation, he has nonetheless been regarded as disabled by Westminster, which has discriminated against him based on his being regarded as disabled.

57. SAD is a physical or mental impairment that substantially limits one or more major life activities, including concentrating.

58. Westminster is an employer, as that term is defined in 42 U.S.C. § 12111(5)(A), with, upon information and belief, more than 1,600 employees.

59. The ADA, 42 U.S.C.A. §12112(a) provides: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

60. The allegations set forth in this Complaint allege a prima facie case of disability discrimination in that they allege and show that:

   a. Mr. Communal is a disabled person, or was a "regarded as disabled" person, as those terms are defined by the ADA,;
   b. Mr. Communal was and, despite his disabilities, remains qualified to perform the essential functions of the job he held;
   c. Mr. Communal suffered discrimination and harassment, including the termination of his employment, by Westminster because of his disability.

61. Westminster's discrimination against, and harassment of, Mr. Communal was intentional.

62. Because of Westminster's discrimination and harassment, Mr. Communal has suffered, and is continuing to suffer, economic and compensatory damages, including emotional distress damages, in an amount to be proven at trial.

63. Mr. Communal is also entitled to punitive damages for Westminster's malicious or reckless act of discrimination and harassment against him.

## JURY DEMAND

Mr. Communal demands a jury trial on all claims or issues so triable.

## PRAYER FOR RELIEF

ACCORDINGLY, Mr. Communal requests judgment in his favor, and against Westminster for the following:

A. Back pay, including but not limited to wages, salaries, bonuses, and benefits, to be adjusted for tax consequences of receiving a lump-sum back pay in a single year;

B. Reinstatement and restoration of benefits;

C. Front pay;

D. Compensatory damages recoverable under the ADA;

E. Pre- and post-judgment interest at the statutory rate;

F. Under the ADA, costs, expenses, and attorney fees incurred in connection with this action;

G. Punitive damages;

H. Equitable relief, not otherwise requested in this Prayer for Relief;

I. Affirmative relief such as expunging adverse material from Mr. Communal's personnel files, and providing positive letters of recommendation; and

J.      Such other and further relief as this Court deems just and proper.

Respectfully submitted this 22th day of October, 2019.

                                            ANDERSON BARKLEY, LLC

*A duly signed copy is on file at the offices of Anderson Barkley, LLC*

s/ Jeanine M. Anderson
***Jeanine M. Anderson***
Anderson Barkley, LLC
3900 E. Mexico Ave., Suite 300
Denver, CO 80210
(720) 506-1766
Jeanine@AndersonBarkleyLaw.com
Attorney for Plaintiff

s/ Richard P. Barkley
*Richard P. Barkley*
Anderson Barkley, LLC
3900 E. Mexico Ave., Suite 300
Denver, CO 80210
(720) 506-1767
richardbarkleylaw@comcast.net

Attorney for Plaintiff

15